IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Virginia

NOV 18 2009

CLERK, U.S. DISTRICT COURT

JAMES RIVER MANAGEMENT COMPANY,
INC., et al.,

    Plaintiffs,

v.                        Civil Action No. 3:09cv387

MICHAEL P. KEHOE, et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the court on the Defendants' Joint Motion to Dismiss Counts VII, XII, and XVII of Plaintiff's First Amended Complaint (Docket No. 60). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

On June 19, 2009, James River Management Company Inc., James River Group Inc., and James River Insurance Company (collectively "James River") filed this action against Kinsale Management, Inc., Kinsale Capital Group, Inc., Kinsale Capital Group, Inc.[1] (collectively "Kinsale"), William Kenney, Brian Haney, Ann Marie Marson, Edward Desch

---

[1] The Complaint names the "Kinsale Capital Group, Inc." as a Defendant twice. From the substance of the Complaint, however, it appears that these Defendants should have been listed as "Kinsale Capital Delaware" and "Kinsale Capital Virginia."

1

(collectively "James River Individual Defendants"), Michael Kehoe, and Greg Share.

In various iterations, the original sixteen-count Complaint asserted claims against the Defendants for: (1) violations of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C); (2) Statutory Business Conspiracy under Va. Code §§ 18.2-499 et seq.; (3) Common Law Conspiracy; (4) Breach of Contract; (5) Tortious Interference With Contract; (6) Misappropriation of Trade Secrets under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 et seq.; (7) Breach of Fiduciary Duty; (8) Aiding and Abetting Breach of Fiduciary Duty; (9) Tortious Interference With Prospective Business Relations; (10) Conversion of Property; (11) violations of the Virginia Computer Crimes Act, Va. Code § 18.2-152.4; and (12) Breach of Confidentiality Agreement.

Fundamentally, James River alleges that "[t]hrough a deceitful scheme and conspiracy, Defendants, acting in concert, have harmed James River's business through unlawful acts . . . all committed by once trusted (and now former) high-level senior executives of the company in order to form a new competitive venture." Compl. at ¶ 1. Specifically, the Complaint sets forth the following factual exposition.

James River, which was founded in September 2002, is a specialty insurance company. Compl. at ¶ 6. Pursuant to a signed Employment and Arbitration Agreement, Kehoe became President and CEO of James River on November 2, 2002. Compl. at ¶ 16. Section 4 of the Employment and Arbitration Agreement prohibits Kehoe from divulging or using for his own benefit, either during or subsequent to his employment with James River, any confidential information learned or developed by him during his employment. Compl. at ¶ 37. In relevant part, the Agreement provides:

> CONFIDENTIAL INFORMATION. Executive will not at any time during the term of this Agreement or thereafter reveal, divulge or make known to any person, firm or corporation or use for his personal benefit or the benefit of others (except the Company), directly or indirectly, any Confidential Information received or developed by him during the course of his employment.

Compl. at ¶ 37.

Section 5 of the Employment and Arbitration Agreement contains detailed covenants of non-competition and non-solicitation. Compl. at ¶ 39. Pursuant to Section 5 of the Agreement, Kehoe covenanted and agreed that, *inter alia*, during his employment with James River, and for one year after his employment ended, he would: (1) not engage in any business that competes with James River, nor would

3

he assist any other person or entity to engage in or have an ownership in such a business; (2) he would not provide services to any competitor of James River for up to two years after his termination; (3) he would not solicit "customers, insurance agents, insurance agencies, wholesale brokers, wholesale agents, managing general agents, or other individuals or entities necessary to" James River's operations; and (4) he would not solicit, either directly or indirectly, any employees of James River to leave James River or to join a competitor of James River.  Compl. at ¶ 39.

In addition to the Employment and Arbitration Agreement, James River's Employee Handbook sets forth certain responsibilities of all James River employees. Compl. at ¶ 42.  The Employee Handbook contains a "confidentiality" provision, which states that "under no circumstances" should an employee share confidential information with individuals outside of the company. Compl. at ¶ 45.  This prohibition "continues in effect after [the employee] leave[s] the company."  Compl. at ¶ 45.  The Employee Handbook also counsels employees to avoid engaging in activities that conflict or compete with James River's corporate interests.  Compl. at ¶ 46.  The Employee Handbook was distributed to Kehoe and to each of the James

4

River Individual Defendants, and each of these individuals acknowledged receipt of the Employee Handbook in writing.

Kehoe served as the President and CEO of James River from November 2002 through March 2008.   Compl. at ¶ 2. Beginning in the middle of 2007, James River began to search for a strategic partner to acquire the company through a corporate merger.   Compl. at ¶ 47.   During the period of solicitation, Fortress Investment Group, LLC ("Fortress") expressed interest in engaging in such a transaction with James River.   Compl. at ¶ 48.   As a precursor to the merger, Fortress and James River undertook a period of due diligence, which was controlled by a Non-Disclosure Agreement.   See Compl. at ¶ 49.   The Non-Disclosure Agreement made clear that Fortress could disclose the proffered "Evaluation Materials" only to representatives who agreed to abide by its terms. Specifically, the Non-Disclosure Agreement provided:

> Evaluation Material may be disclosed to your Representatives who need to know such information solely for the purpose of evaluating a Possible Transaction on your behalf (it being understood that such Representatives shall be (a) informed by you of the confidential nature of the Evaluation Material, (b) directed by you to treat the Evaluation Material confidentially and (c) informed by you that by receiving the Evaluation Material they are agreeing to act in compliance with the terms of this Agreement for the benefit of the Company).

Compl. Ex. B at 2.   The Non-Disclosure Agreement also provided that Fortress and its representatives agreed not to solicit any James River employees for a period of two years from the date of the execution of the Agreement.  Id. at 2, 3.   Additionally, the Non-Disclosure Agreement provided that, in the event of a breach or threatened breach of the Agreement by Fortress or its representatives, James River would have the right to seek "equitable relief, including injunction, without proof of actual damages." Compl. at ¶ 51.

Fortress's due diligence undertaking was led by Greg Share, who was then a Managing Director of Fortress. Compl. at ¶ 52.   Through this effort, Share acquired "intimate knowledge" of James River's proprietary information, and he was assertedly bound by the terms of the Non-Disclosure Agreement to keep that information confidential.  Compl. at ¶ 53.  Fortress did not ultimately acquire James River.  Compl. at ¶ 54.  Nevertheless, James River was able to find a suitable merger partner.

Shortly after the sale of James River closed in December 2007, Kehoe and the James River Individual Defendants received millions of dollars in bonuses and proceeds from the exercise of their stock options.  Compl. ¶¶ 61-67.  On March 6, 2008, Kehoe resigned from James

6

River.   Compl. at ¶ 69.   Kehoe received his last salary payment from James River on May 31, 2008, and he was informed that his non-solicitation and non-compete period ran from one year after May 31, 2008 to June 1, 2009. Compl. at ¶ 68.

The non-solicitation and non-compete agreements notwithstanding, Kehoe allegedly posted, shortly after his resignation, a website at www.kinsaleinsurance.com, which was registered to Kehoe on March 14, 2008.  Compl. at ¶ 75. In substance, "the Kinsale website stated that Kehoe intended to start Kinsale . . . ."  Compl. at ¶ 75.

In the summer of 2007, Share left Fortress and joined Moelis & Company.   Compl. at ¶ 55.   James River alleges that, "after joining Moelis, and in violation of the confidentiality and non-solicitation terms of the Fortress [Non-Disclosure Agreement], by which he was still bound, Share, with and on behalf of his new employer Moelis, helped Kehoe start Kinsale by, *inter alia*, assisting Kehoe and Kinsale with obtaining financing from, or through, Moelis using the confidential information learned from James River pursuant to the [Non-Disclosure Agreement]." Compl. at ¶ 57.   On March 27, 2008, Kehoe incorporated Kinsale Capital Virginia.  Compl. at ¶ 77.

7

In the spring of 2009, Haney held a barbeque at his house, which was attended by Kehoe and the James River Individual Defendants. Compl. at ¶ 94. This gathering allegedly was used to encourage the James River Individual Defendants to resign their positions with James River and to join Kinsale. Compl. at ¶ 94. James River also avers that, in March 2009, Kenney "requested that the hard drives of James River executives be swapped out and upgraded with the latest hardware." Compl. at ¶ 107. Kenney allegedly used this opportunity to copy James River's confidential and proprietary information for use at Kinsale, and to thereby "make the discovery of [the Defendants'] espionage more difficult." See Compl. at ¶¶ 11, 101-20.

On May 10, 2009, Kehoe posted a job opening for Kinsale Capital on iHireHR.com seeking a "Human Resource Generalist" for a "specialty [insurance] company headquartered in Richmond." Compl. at ¶ 79. Moreover, "[p]rior to the expiration of his non-compete and non-solicitation agreement," Kehoe allegedly began "soliciting key employees of James River to resign their employment and join Kinsale." Compl. at ¶ 80. And, "[i]n conjunction with these former employees, [Kehoe] attempted to mask his violation of his non-solicitation agreement by posting advertisements [on Craigslist on May 31, 2009] for specific

8

positions to be filled by his co-conspirators so that they could claim that they were simply responding to an advertisement and that there had not been a prohibited solicitation." Compl. at ¶ 80.

Both Kinsale Management and Kinsale Capital Delaware were incorporated on June 4, 2009. Of the aforementioned group of "key James River employees," the James River Individual Defendants left James River to join Kinsale "shortly after the June 1, 2009 expiration of the non-solicitation provision of the Kehoe Employment Agreement." See Compl. at ¶¶ 93, 95-100. Specifically, the defections of the James River Individual Defendants occurred between June 8 and June 15, 2009.

Principally, James River alleges that "[e]ach of the James River Individual Defendants had access to valuable trade secrets and confidential and proprietary information belonging to James River during the course of their employment at James River. Upon information and belief, each James River Individual Defendant has used or has plans to use [this confidential information] for the benefit of his or her new employer, Kinsale." Compl. at ¶¶ 101, 103. James River also alleges that Kinsale continues to solicit key James River employees and seeks to have those employees

misappropriate James River's confidential and proprietary information.  Compl. at ¶ 105.

On July 13 and 14, 2009, Share, Kinsale, and the James River Individual Defendants filed motions to dismiss various claims against them.  The motions were fully briefed, and argued before the Court on August 25, 2009. Following argument, the Court conferred with the parties and issued several rulings on the motions to dismiss, which were memorialized in an Order (Docket No. 50) dated August 27, 2009.  No written opinion was issued in the matter. Dismissing one count (Count XII, alleging Tortious Interference with Business Relations) and trimming several others, the Court granted the plaintiff leave to file an amended complaint.  The First Amended Complaint ("FAC") was filed on September 4, 2009, and this motion to dismiss ensued.

The factual gist of the FAC is the same as the original Complaint.  However, the FAC contains 23 more pages and 100 more numbered paragraphs.  This, as the Defendants correctly observe, was not the kind of amendment contemplated by the Court when it accompanied the grant of leave to amend with the admonition to be specific and precise and to be discerning in the assertion of claims and

the naming of defendants. The approach taken by the Plaintiffs in the FAC prompted this dismissal motion.

The Defendants jointly seek to dismiss Kinsale from Count VII, and they seek to dismiss Counts XII and XVII from the Amended Complaint. As to Count VII, which alleges a statutory claim for Misappropriation of Trade Secrets, the Defendants object to the addition of Kinsale to this claim, which previously had been alleged only against Kehoe and the James River Defendants. As to Count XII, alleging Conversion, the Defendants maintain that the Plaintiffs have not shown, as the Court requested when granting leave to amend, "who converted what" (Transcript, at 90:23). As to Count XVII, simply entitled "Restitution -- Unjust Enrichment," the Defendants assert that the Plaintiffs were not given leave to add this new claim to their amended complaint.

Unsurprisingly, the Plaintiffs have a response to each of these contentions. First, the Plaintiffs argue that "adding Kinsale to Count VII" did not either prejudice or surprise Kinsale, and was part of the Plaintiffs' efforts to add clarity and precision to the Complaint. Pl. Oppo. Mem. at 4. Next, the Plaintiffs contend that, in Count XII (Conversion), they pled the claim with enough specificity to survive a motion to dismiss. Id. at 7-15. Third, the

Plaintiffs argue that Count XVII, which alleges unjust enrichment, is nothing more than a remedial request, a formality that adds nothing of substance, and thus does not prejudice the Defendants. Id. at 6. Finally, as a general observation, the Plaintiffs note that, even if they did not technically have leave to amend the Complaint in the precise way that they did, "the Court could issue an order accepting the First Amended Complaint as is." Id. at 4.

## DISCUSSION

Each of these issues will be addressed in turn.

### A. The Applicable Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) seeks to test the legal sufficiency of the factual allegations made in the Complaint. Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Id. As the Supreme Court held in Bell Atlantic v. Twombly, 550 U.S. 544 (2007), the pleading standard that Rule 8(a) announces does not require "detailed factual allegations," but it demands more than an unadorned accusation. Id. at 555. A pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Id. Nor does a complaint suffice if it tenders only "naked

assertion[s]" devoid of "further factual enhancement." Id. at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted by the court as true, to "state a claim to relief that is plausible on its face." Id. at 570. A claim has facial "plausibility" when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." Id. at 557. Nevertheless, in Twombly, the Supreme Court repeatedly emphasized that alleging plausible grounds for a claim "simply calls for enough facts to raise a reasonable expectation that *discovery* will reveal evidence" to prove the alleged claim. Id. at 556 (emphasis added). This pleading standard governs "all civil actions and proceedings in the United States district courts." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009).

**B. Whether the Plaintiffs' Amendments to the Complaint were Within the Scope of the Court's Leave to Amend.**

Fed. R. Civ. P. 15(a)(2), which governs pleading amendments made at this stage of litigation, provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Rule 15(a) serves as a tool that permits Courts to manage pleadings and the pending case to the end that cases should be disposed of on their merits where there is merit that has not been, but can be, properly pled. See, e.g., Summit Office Park, Inc. v. United States Steel Corp., 639 F.2d 1278, 1284 (5th Cir. 1981) ("[T]he intent of the rule is to assist the disposition of litigation on the merits of the case rather than have pleadings become ends in themselves.").

The Defendants cite two cases, U.F.C.W. Local 56 Health & Welfare Fund v. J.D.'s Market, 240 F.R.D. 149 (D.N.J. 2007) and Kuntz v. New York State Board of Elections, 924 F. Supp. 364 (N.D.N.Y. 1996), for the proposition that Fed. R. Civ. P. 15(a) allows only "those substantive amendments specifically requested and granted by the court." The Defendants correctly describe the holdings in both cases, but each of them arose in a

14

significantly different factual context. Both U.F.C.W.
Local 56 and Kuntz involved recalcitrant plaintiffs who had
simply, and rather flagrantly, refused to follow very
specific instructions from the Court. See U.F.C.W. Local
56 at 151-52 (adding four new counts naming a decedent's
widow as a defendant after stating "that they had no
intention of doing so"); Kuntz at 367 (dismissing a
Plaintiff's amended complaint, which added parties such as
the New York State Senate and nine John Does, for flagrant
refusal to follow a Court Order).

In this action, there is some legitimate dispute
whether the leave to amend the Complaint covered two of the
three specific amendments made by the Plaintiffs: (1)
adding Kinsale to Count VII; and (2) adding a new Count
XVII, "Restitution -- Unjust Enrichment."[2] The propriety
of each of these amendments is discussed below.

## C. The Counts that the Defendants Seek to Dismiss

Before addressing the specific counts for which the
Defendants seek dismissal, it is worth noting that the
Plaintiff appears to have misinterpreted the Court's
intended purpose in allowing them to amend. The Court
enjoined clarity, precision, and brevity (the suggested

---

[2] The Defendants do not assert that the Plaintiff's Amended Count
XII (Conversion) exceeded the scope of the Court's leave to amend, as
the Court explicitly provided leave to amend this count.

trimming down of the Complaint) as lodestars for the Plaintiffs in their endeavor to amend. What the Plaintiff submitted was a beefed-up complaint, with 23 additional pages and 100 additional numbered paragraphs,[3] that failed to fully reflect the Court's dismissal of certain claims. See Am. Compl. ¶¶ 251, 253 (leaving in claims for injunctive relief that the Court had explicitly dismissed). Some of the additional length may be attributable to the increased specificity that the Court required, particularly respecting the conversion claim. And, to the Plaintiffs' credit, they did drop one Defendant (Ms. Ann Marson) from their claims. But the Amended complaint is no model of brevity or precision.

Also worth noting is that the numbering of all counts in the Amended Complaint from Count XII onward differs from the numbering in the original Complaint. Because the Court dismissed Count XII in the original Complaint with prejudice, the Plaintiffs renumbered their count for conversion, which had been Count XIII, as Count XII. Similarly, the prior Count XIV is the new Count XIII; prior Count XV is now Count XIV; and prior Count XVI is now Count XV. Counts XVI and XVII are both new to the Amended

---

[3]      Much of this paragraph proliferation stems from breaking up longer paragraphs into shorter ones, with minor stylistic changes. Compare Compl. ¶¶ 1-11 with Am. Compl. ¶¶ 1-17.

Complaint.  Count XVI was contemplated by the Court as an addition when the Plaintiffs were given leave to amend. See Transcript at 56:11-14; 91:13-17.

Setting aside the foregoing concerns, the Defendants' arguments for dismissal are addressed seriatim.

1.    Count VII -- Misappropriation of Trade Secrets

The Defendants do not seek to dismiss Count VII in its entirety.  Rather, they seek to dismiss it only as to Kinsale, which the Plaintiffs added to this count in their Amended Complaint. Def. Mem. at 6.  First, it is necessary to assess whether this amendment was within the scope of the leave to amend.  If not, it is necessary to assess the propriety of granting such leave retroactively to the Plaintiffs, pursuant to Rule 15(a)'s directive that "[t]he court should freely give leave when justice so requires."

In the Order of August 27, 2009, the Court did not address Count VII, which, in the original Complaint, alleged trade secret appropriation against "Kehoe and the James River Individual Defendants."  Compl. at 38. Nonetheless, the Court urged the Plaintiffs to "give some serious thought to amending the whole [Complaint] and cleaning it up and being precise," and to "seriously reflect[] upon who you really may have claims against and who you may not."  Transcript at 91:4-6, 96:6-7.  In

17

context, the Court's admonition related to the timing of claims such as the allegation of conspiracy, and suggested that the Plaintiffs consider *removing* parties from the complaint. Here, however, the Plaintiffs apparently reflected upon the trade secret misappropriation claim and concluded that, if Kehoe and the James River Defendants illicitly benefited from the trade secrets, Kinsale must also have benefited. Furthermore, it appears that the Plaintiffs concluded that the individuals' knowledge of the trade secrets' confidential nature might plausibly be imputed to the Kinsale Defendants because several of its chief officers already were named as individual defendants. While that was not within the Court's contemplation in granting leave to amend, it was not prohibited by the order.

The Plaintiffs further assert lack of prejudice to Kinsale. Pl. Oppo. Mem. at 4. The Plaintiffs note that Kinsale already had issued discovery requests pertaining to trade secret misappropriation in advance of the Amended Complaint. Id. at 5-6. Additionally, the Plaintiffs state that the Amended Complaint was filed on September 4, giving the Defendants time to prepare to depose the Plaintiffs on September 21, 2009 respecting this count.

The Kinsale Defendants are represented by separate counsel, and do not have complete identity of interest with the other Defendants in Count VII. But Kinsale is hardly prejudiced. The original Complaint alleged its involvement in a Statutory Business Conspiracy in Count III (alleging, among other things, that the conspirators "misappropriate[ed] Plaintiff's trade secrets," Compl. ¶ 144(a)), and in a Common Law Conspiracy in Count IV, (alleging, likewise, trade secret misappropriation, Compl. ¶ 153(a)). It also named Kinsale in the Conversion claim, Compl. ¶¶ 234-42, at the core of which was the alleged "wrongful control" over electronic documents containing the Plaintiffs' trade secrets. Counsel for Kinsale cannot competently defend against these claims without addressing the central issue of trade secret misappropriation. Thus, the prejudice of adding Kinsale to an existing claim is minimal.

Overall, because the Plaintiffs may have reasonably interpreted the leave granted to amend as encompassing this sort of amendment, and because Kinsale is not prejudiced by adding Count VII to the list of claims to be defended, it would be improper to dismiss Kinsale from Count VII.

### 2. Count XII -- Conversion

In Count XII of the FAC, James River alleges conversion against all Defendants. Specifically, James River avers that the "Defendants exercised wrongful control over Plaintiffs' proprietary, confidential and trade secret information by misappropriating it and sharing it with Plaintiffs' competitor." Am. Compl. at ¶ 317. In response to this allegation as made in the original Complaint, the Defendants moved to dismiss this count because "the Complaint [did] not allege what tangible property or specific thing belonging to a plaintiff the Defendants are] supposed to have taken." Share's Mot. at 15. The Court, in its Order of August 27, 2009, granted the Defendants' motion with leave to amend. The Court specifically instructed the Plaintiffs to "specify who converted what." Transcript, at 90:23. The Plaintiffs assert that they have done so; the Defendants assert that they have not, at least not in a manner that passes muster under Twombly.

Under Virginia law, "[a] person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." Simmons v. Miller, 261 Va. 561, 582

(2001). While a claim for conversion generally applies only to tangible property, "courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document." Combined Ins. Co. v. Wiest, 578 F. Supp. 2d 822, 835 (W.D. Va. 2008) (citing United Leasing Corp. v. Thrift Ins. Corp., 247 Va. 299, 304 (1994)). Consequently, a conversion claim does not fail merely because the property at issue is "an electronic version of [the document] rather than a hard copy." Wiest, 578 F. Supp. 2d at 835. But, it is a significant fact whether the intangible right arises from or is merged with a document.

The FAC provides some, but not much, more detail than the original Complaint respecting *what* was converted. See Am. Compl. ¶¶ 165-83. James River further alleges, as before, that the Defendants are in possession of, and are currently utilizing (or plan to utilize), James River's proprietary information. See, e.g., Am. Compl. ¶¶ 181-82.

However, the conversion claim, as stated in the FAC, is noticeably short respecting *who* converted the property in question, what the property was, and whether it arises from or is merged with a document and, if so, what document. For the most part, James River has simply continued its approach of alleging that all Defendants are

responsible for all converted items.  James River then uses its Opposition Memorandum to supplement its information respecting *who* took what property.  See Pl. Oppo. Mem. at 12-16 (alleging specific documents converted by Defendants Kehoe, Desch, and Haney that were revealed during discovery, and during James River's own further forensic analysis).

The Defendants note that, in the <u>Wiest</u> and <u>Gilliam</u>[4] cases that the Plaintiff cites (Pl. Oppo. Mem. at 11), the plaintiffs identified which specific information was taken by which specific defendant.  Def. Reply at 7.  However, this is hardly a fair comparison.  In both cases, the Plaintiffs proceeded against a single defendant.  If their property was converted by a defendant, there was no question as to who converted the property.  In this action, the Plaintiffs have reason to suspect that their property was converted, but there were many defendants in position to have converted their property.  Nonetheless, the fact remains that the Court directed the Plaintiffs to identify who took what.  They have not complied with that directive.

The Defendants also contend that "[i]t is totally improper for Plaintiffs to refer to, or rely upon, information outside the pleadings in response to a motion

---

[4]   <u>International Paper Co. v. Gilliam</u>, 63 Va. Cir. 485 (2003).

to dismiss." Def. Reply at 3; see also id. at 8 (citing Bosiger v. U.S. Airways, 510 F.3d 442, 450 (4th Cir. 2007).[5] It is true that the Defendants cannot rely on documents outside the pleadings to challenge a motion to dismiss. However, here the Plaintiffs are seeking to substantiate the plausibility of their claims. Undoubtedly, the Plaintiffs should have included this factual support in the FAC instead of their Opposition Memorandum. But, to dismiss the claim now would be to ignore the plausibility of their assertions. For that reason, it is appropriate to require that the Plaintiffs further amend their complaint,[6] this time, alleging for each Defendant, what property the Defendant allegedly converted, mindful of the principles set out in Wiest. However, the Plaintiffs must realize that failure to do it right this time likely will lead to dismissal of Count XII.

### 3. Count XVII -- Restitution/Unjust Enrichment

In Count XVII of the FAC, a wholly new count, the Plaintiff incorporates the entirety of the rest of the

---

[5] Notably, Bosiger, 510 F.3d at 450, found that consideration of extensive evidence from outside the pleadings had converted the Rule 12(b)(6) motion to dismiss into a Rule 56 summary judgment motion, and decided the motion under the Rule 56 standard. The court did not dismiss a Plaintiff's claims because its factual sufficiency hinged upon a document outside the pleadings, as the Defendants in this action urge this Court to do.

[6] See Pl. Oppo. Mem. at 12 fn.2 ("If the Court declines to consider information outside the pleadings on this motion, James River respectfully asks for leave to amend the complaint to reflect the new information that has been uncovered during discovery.").

complaint and seeks damages for unjust enrichment. The
Plaintiff appears to recognize the superfluous nature of
this claim, specifically stating that it was "unnecessary
to include restitution as a separate count in the original
complaint."    Pl. Oppo. Mem. at 6.    That observation
notwithstanding, the Plaintiffs tack this claim onto the
end of the FAC "as a formality in order to avoid any
conceivable claim of prejudice."    Id. at 7.    As the
Plaintiffs articulate it, they simply want to be able to
measure damages for all counts in terms of the Defendants'
gain, as opposed to the Plaintiffs' loss.

Understanding restitution in these terms, as a remedy
rather than a right, one can see why the Plaintiffs might
seek recovery on this basis.    It is conceivable that the
Defendants could, using the Plaintiffs' trade secrets,
garner new business in a market in which the Plaintiffs did
not compete and had no intentions of competing.    In such a
scenario, the Plaintiffs would not suffer a direct loss, as
the Defendants' illegitimate profits would come from
clients that the Plaintiffs never would have obtained.
Still, such conduct by the Defendants could, conceptually,
involve the illegitimate use of the Plaintiffs' trade
secrets, and the Plaintiffs may thus wish to seek
restitution.    However, in this case, it is unclear how this

24

conceptual possibility would ever come to fruition, particularly because the Defendants presently are doing no business and have no customers.

More importantly, the Plaintiffs have demonstrated no need to include restitution as a separate count. Va. Code § 59.1-338(A) already allows a Plaintiff to recover for "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Nor is it explained how recovery under any other theory would permit the unjust enrichment remedy.

Finally, the Plaintiff's prayer for relief renders this count doubly redundant. See Am. Compl. at 75, ¶ D. This section specifically requests "restitution, in an amount to be determined at trial, for the value of benefits received by Defendants through their unlawful acts or lawful acts through unlawful means." Id. Count XVII thus adds only confusion to an already complex complaint. Thus, Count XVII is futile and will be dismissed as such. Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999).

## CONCLUSION

For the foregoing reasons, the Defendants' Joint Motion to Dismiss Counts VII, XII, and XVII of Plaintiff's First Amended Complaint (Docket No. 60) will be denied as to Count VII and Count XII, and granted as to Count XVII.

It is SO ORDERED.

                                         /s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:   November 17, 2009