IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


FILED
FEB - 5 2010
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

JAMES RIVER MANAGEMENT
CO., INC., et al.,

    Plaintiffs,

v.                          Civil Action No. 3:09cv387

MICHAEL P. KEHOE,
et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL OAKES (Docket No. 128). For the reasons set forth below, the motion will be granted.

In support of their damages claims, the Plaintiffs (hereafter collectively referred to as "James River") have tendered the expert report of Michael Oakes to forecast the testimony that he will give about certain aspects of James River's asserted damages. Oakes is the Chief Financial Officer of Franklin Holdings (Bermuda) Ltd. which is the ultimate parent company of James River. According to the report, the opinions expressed by Oakes are based on his "personal knowledge, acquired through [his] day-to-day activities as Franklin Holdings' Chief Financial Officer." Oakes says that his principal opinion is:

> For every $100 million in premium business written by Kinsale that would have been written by James River in the absence of Defendants' conduct, James River suffers

>     injury in an amount ranging from $54.48 million to $95.34 million.

In essence, Oakes' opinion on loss is one as to the diminution in the value of James River.

The starting point for Oakes' opinion is that "it is likely that excess and surplus lines customers obtained by Kinsale are customers that either were existing James River customers or are customers that would have been available to James River in the absence of Defendants' conduct." According to Oakes, that assertion is made because, in the excess and surplus lines insurance business in which James River deals and in which Oakes forecasts Kinsale to be dealing, there are specialized insurance products, and because the Defendants have "detailed familiarity" with James River's customer base.

Oakes recites that, in the first six months of 2009, James River "would earn an annual after-tax profit (comprised of underwriting profit and investment income) of $6,810,375 on a marginal $100 million of premiums." He then posits that, as a matter of financial valuation, it is appropriate to multiply earnings by a factor of between eight and fourteen to determine the insurer's value. This, according to Oakes, was the range within which James River was valued in 2007 when D.E. Shaw acquired it. Using the "eight to fourteen multiplier," Oakes opines that, "with James River earning about $6.8 million in after-tax net profit on each $100 million in premiums, James

River's loss of $100 million in premiums to Kinsale would negatively affect James River's value as a company by $54.48 million to $95.34 million (or $6,810,375 multiplied by a factor somewhere between eight and fourteen)." Using the same approach, he forecasts that the loss on $50 million in premiums to Kinsale would negatively affect James River's value by $27.24 million to $47.67 million.

There are two exhibits to Oakes' opinion: (1) his CV which shows extensive employment in the financial world; and (2) a conclusory table, derived from James River's records, in which Oakes sets forth figures showing underwriting profit, investment income, pretax income, taxes, and net income/loss profit figures based upon $50 million worth of premiums and $100 million worth of premiums. The table then reflects, in tabular form, the application of the multiplier to the net profit. The result is the projected diminution in value of the company which James River seeks to recoup in this action.

The Defendants contend that Oakes' opinion fails to qualify under Federal Rule of Evidence 702, the decisions of the Supreme Court of the United States in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), and various decisions issued after <u>Daubert</u> and <u>Kumho</u>. Oakes' primary opinion is elucidated to some degree by his deposition testimony. According to the

3

deposition testimony cited by the Defendants, Oakes arrived at that theory of damages which he postulates "during a conference call on a Friday afternoon," Def. Memo. at 5, and sent an email to counsel the following day summarizing his theory. After that, counsel wrote the report, based on Oakes' theory, which Oakes reviewed on or about the day it was filed. The deposition testimony citations also reflect that Oakes' theory of damages is indeed a theoretical prediction. The Defendants also contend that the theory overlooks numerous factors that would have an impact on any damages.

## DISCUSSION

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, scientific, technical, or other specialized knowledge may be presented to the jury by an expert witness if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." The testimony may be given in the form of an opinion or otherwise if it is "based upon sufficient facts or data," it is the "product of reliable principles and methods," and if "the witness has applied the principles and methods reliably to the facts of the case." Id.

The provisions of Rule 702 reflect the decisions of the Supreme Court in Daubert and Kumho. As Daubert announced, the trial judge "must ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. The requirement that the testimony of an expert must pertain to "scientific, technical or specialized knowledge" is intended to establish "a standard of evidentiary reliability." Id. at 590. The requirement that the evidence of testimony will assist the trier of the fact to either understand the evidence or to determine a fact in issue are conditions that go to the question of relevance. Id. at 591. Another aspect of relevance "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. That requirement is sometimes referred to as "fit" and "'[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id.

In Kumho, the Supreme Court applied the basic principles that animated its decision in Daubert to testimony that is not scientific in nature but that is based on the expert's knowledge and experience. In Kumho, the Court held that the gatekeeping responsibility, to assure the reliability and relevance of expert testimony, applies with equal force to non-scientific evidence and, indeed, to all expert testimony. Kumho, 526 U.S. 149. To that end, the Court, in Kumho, held that the factors outlined in Daubert can be pertinent to the gatekeeping function. The Court

made clear also that those factors constitute a non-exclusive recitation of matters to be considered in determining the reliability of expert testimony. Id. at 150.

Thus, in Kumho, the Supreme Court recognized that a number of specific factors from Daubert could be considered in the exercise of the trial judge's gatekeeping function, including:

> -- whether a 'theory or technique . . . can be (and has been) tested;'
>
> -- whether it 'has been subjected to peer review and publication;'
>
> -- whether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation;' and
>
> -- whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'

Kumho, 526 U.S. at 149-50 (citing Daubert, 509 U.S. at 592-94). It is up to the trial court to determine whether all or any of these factors are to be applied in assessing the reliability of the expert testimony. The gatekeeping requirement specified by Daubert is, according to Kumho, intended both to ensure "reliability and relevancy of expert testimony" and to make certain that an expert, whether basing testimony upon professional studies or personal experience, "employs in the courtroom the same level of intellectual rigor and characterizes the practice of an expert in the relevant field." Kumho, 526

U.S. at 152. These fundamental precepts inform the determination whether Oakes' testimony is admissible in this case.

First, it appears to be uncontested that Oakes is imbued with financial expertise and that he has experience in the area generally. However, nothing in the record shows that Oakes has experience in the valuation of insurance companies. Nonetheless, his responsibility as Chief Financial Officer of the company which owns James River imbues him with sufficient knowledge about the financial matters of James River to qualify him as an expert in the area. The Defendants do not seem to argue otherwise.

Second, Oakes' report and proposed testimony fail the basic requirements of Daubert and Kumho. To begin, neither the report nor the testimony evinces any showing that Oakes' theory of damages can be, or has been, tested. That D.E. Shaw used the multiplier of eight to fourteen shows only that it has been used, not that it has been tested.

Nor, is there any showing that the theory posited by Oakes has been peer reviewed or that it enjoys general acceptance within a relevant community of expertise.[1] And, although error

---

[1] Although James River notes a "general acceptance" (Kumho, 526 U.S. at 150) of other econometric estimates in other scenarios, it has cited no decision countenancing a house-of-cards model like the one employed here, in which Oakes extrapolates James River's decline in future value from a speculative estimation as to the wide variety of factors that would cause it, while failing to estimate the degree to which a decline in value would stem from Kinsale's wrongful conduct, and

rates surrounding projections such as Oakes' may be unobtainable in precise numerical form, the sheer number of assumptions that Oakes' model requires indicates enough opportunities for error to cast serious doubt upon his methodology.

Perhaps most importantly, there is nothing in the report or Oakes' testimony to demonstrate that his theory respecting the diminution of the value of James River has been arrived at by applying the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. It is true that Oakes recites that, in a particular purchase, this method of establishing a range of values for the purpose of acquiring a company was used in one instance. But beyond that, it has not been shown that this theory is applied by experts in the field in the fashion applied here by Oakes to determine the extent to which the value of a company has been diminished by the kinds of activities that the Defendants allegedly perpetrated.

Further, there is no rational basis offered to explain why the assumptions on which Oakes bases his opinion are applicable to the facts of this case. There is, for example, no showing that the two premium levels ($50 million or $100 million) are an appropriate basis upon which to make any calculation.[2] Oakes

---

not even addressing the extent to which James River could mitigate its damages.

[2] James River does identify some projections made by Kinsale that are in accord with its range of $50-100 million in initial

8

acknowledged his position that those numbers are simply estimates unrelated to any actual business that had been written by Kinsale and that they are his view about the amount of capital he thought a start-up company would require. Oakes' opinion is flawed for the additional reason that he assumes that, "but for the alleged misconduct of the Defendants, James River would have written every single dollar of premium that Kinsale will write in the future if those premiums relate to lines of insurance that James River offers." Def. Memo. at 12. That, of course, ignores the fact that there are a number of other competitors in the excess and surplus lines insurance business and Oakes, admittedly, did not consider the impact of other competitors. That is a serious flaw where, as here, James River has such a small part of the market (less than 1%) and competitors have approximately 99.5% of the market.

Oakes' opinion also ignores that some of the business that would not be written by James River because it did not want to accept the risk. And, it likewise ignores the fact that Kinsale may underwrite some policies that James River would not have underwritten or as to which it would simply not have access.

---

premiums. Pl. Oppo. Memo. at 11. However, there is no indication that Oakes used such an evidentiary foundation for his opinion. Oakes' deposition testimony actually suggests otherwise, that he merely estimated what Kinsale would write based on his industry experience. Though Oakes happens to have estimated correctly, his methodology is nonetheless flawed.

Oakes also leaves out of his analysis any mention of how James River would mitigate its damages. It strains credibility to assert that 100% of Kinsale's business would have derived from James River's customers;[3] and it defies credibility to suggest that James River would not have underwritten a single new policy in lieu of those that went to Kinsale, but instead, simply would have let its premium levels shrink by $50 to $100 million.

Perhaps the most glaring deficiency in Oakes' cobbled-together theory is the application of the multipliers from an arbitrary range of eight to fourteen. He recites that as an appropriate range to use in valuing a company. That might be so under certain circumstances, but Oakes makes no showing that it is an appropriate mode to assess the diminution value of a company caused by the circumstances that James River alleges in its claims in this case.

For this reason, and the others recited above, the testimony fails the reliability factor specified by Rule 702. Relatedly, the opinion also fails the "fit" requirement because the theory posited by Oakes is not tethered to the facts of this case. The opinion also fails the fit requirement because the estimated diminution in value of the company is not tied in any way to any particular misconduct in which the Defendants are alleged to have

---

[3] As the Defendants note, whether these "customers" refer to brokers or ultimate policyholders is unclear from Oakes' model and his deposition testimony.

engaged. That deficiency further underscores the lack of relevance in the testimony proposed by Oakes. Indeed, the testimony proffered by Oakes would be far more likely to confuse and mislead, than to assist, the finder of fact.

James River's plaintive cry, that the Defendants attempt to force it to make a Hobbesian choice to either "sit passively by while Kinsale stole its business, and try to recover those damages later, or file suit as soon as feasible and thereby forfeit any future damages they will suffer," does not fall upon deaf ears. But, it proves too much because James River faces no such choice. If it has other proofs of its claimed damages, they can be presented if they are admissible. But James River cannot expect to offer up a facially defective damages model and have it pass muster under Rule 702, Daubert, Kumho, and their progeny.

## CONCLUSION

For the foregoing reasons, DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL OAKES (Docket No. 128) will be granted.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 5, 2010